# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TERRY C. KEMPER,

Plaintiff,

v.

WARDEN PAUL KEMPER,

Defendant.

Case No. 17-CV-1123-JPS

## ORDER

Plaintiff Terry C. Kemper ("Kemper") is a Wisconsin prisoner and a child sex offender, having been convicted of sexually assaulting a three-year-old girl. He admits to having deviant sexual fantasies concerning young girls. He chafes under prison regulations that require psychologists to review publications he orders to determine if they contain inappropriate matter, including sexualized depictions of children. He brings this action pursuant to 42 U.S.C. § 1983 against the warden of his institution, Paul Kemper (the "Warden"),[1] challenging that review process. The Warden has moved for summary judgment, (Docket #21), and for the reasons stated below, that motion will be granted.

## 1.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir.

---

[1]With a Kemper on either side of the suit, confusion could abound without an alternative designation for Defendant.

2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

2.    **RELEVANT FACTS**

   2.1    **Kemper's Failure to Dispute the Material Facts**

   The relevant facts are undisputed because Kemper did not properly dispute them. In the Court's scheduling order, entered October 16, 2017, Kemper was warned about the requirements for opposing a motion for summary judgment. (Docket #10 at 3). Accompanying that order were copies of Federal Rule of Civil Procedure 56 and Civil Local Rule 56, both of which describe in detail the form and contents of a proper summary judgment submission. Most relevant here is Civil Local Rule 56(b)(2), which obligates the non-movant on summary judgment to file "a concise response to the moving party's statement of facts that must contain a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any

disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon[.]" Civ. L. R. 56(b)(2)(B)(i).

Next, on May 25, 2018, the Warden filed the instant motion for summary judgment. (Docket #21). In the motion, the Warden also warned Kemper about the requirements for his response as set forth in Federal and Local Rules 56. *Id.* at 1–2. He was provided with additional copies of those Rules along with the Warden's motion. *See id.* at 3–11. In connection with his motion, the Warden filed a supporting statement of material facts and accompanying evidence that complied with the applicable procedural rules. (Docket #23, #24, #25, #26, #27). Additionally, in his legal brief, the Warden provided a short, two-page summary of the relevant facts, citing his statement of materials facts. (Docket #22 at 2–4).

In response, Kemper submitted a legal brief, a 110-page set of exhibits, and several boxes of materials that he says are examples of publications he has been denied. *See* (Docket #31, #32, #32-1). In his brief, Kemper reproduced the two-page factual summary from the Warden's legal brief, interlineating his responses to the Warden's factual assertions. (Docket #32 at 1–6). He did not, however, respond in any fashion to the Warden's statement of material facts. Moreover, even his own meager effort at contesting the Warden's evidence is woefully inadequate, as he rarely cites evidence and incorporates unnecessary legal argument. *See id.* Further, the Court reviewed Kemper's stack of exhibits in an effort to unearth potential factual disputes, but without his explanation as to their

significance, they are largely unhelpful. *See* (Docket #32-1).[2] In short, nothing about Kemper's submission comes close to contesting the Warden's proffered facts as the procedural rules require.

Despite being twice warned of the strictures of summary judgment procedure, Kemper utterly failed to dispute the Warden's proffered facts. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Though the Court is required to liberally construe a *pro se* plaintiff's filings, it cannot act as his lawyer, and it cannot delve through the record to find favorable evidence for him. *See Waldridge*, 24 F.3d at 922; *Herman v. City of Chi.*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."). Thus, the Court will deem the Warden's facts undisputed for purposes of deciding his motion for summary judgment. *See* Fed. R. Civ. P. 56(e); Civ. L. R. 56(b)(4); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006) (noting that district courts have discretion to enforce procedural rules against *pro se* litigants).

### 2.2 Facts Material to the Warden's Motion

#### 2.2.1 The Parties

Kemper is presently housed at Racine Correctional Institution ("Racine"), a medium-security facility. In 2003, Kemper was found guilty of first degree sexual assault of a child for having sexual contact with a

---

[2] Most of the 110 pages of exhibits are comprised of reproductions of administrative code provisions, Kemper's many interview requests and grievances contesting the denial of publications, the Warden's job description, and a transcript of a state plea withdrawal hearing from 2011. *See* (Docket #32-1). The only materials Kemper submitted that appear minimally relevant were the Warden's discovery responses and copies of inmate classification reports relating to Kemper. In light of Kemper's *pro se* status, the Court reviewed each of his exhibits and finds that none raises a proper contest—procedurally or substantively—to the Warden's proffered facts.

three-year-old girl. *See State of Wisconsin v. Terry Charles Kemper*, Burnett County Case No. 1003CF000135. A separate charge of sexually assaulting a 13-year-old girl was dismissed but read-in for sentencing. Kemper has admitted to both offenses. Kemper has also admitted to sexually assaulting a four-year-old girl. He was sentenced to eight years in prison and ten years of extended supervision. Kemper is presently serving a sentence of imprisonment upon revocation of his extended supervision. He is scheduled to be released in 2020.

Defendant has been the Warden at Racine since December 2012. In this position, he is responsible for the overall administration of the institution, including implementing all Wisconsin Department of Corrections ("DOC") policies, directives, and legislative and judicial mandates. He also acts as the reviewing authority for non-medical inmate grievances filed through the Inmate Complaint Review System ("ICRS").

### 2.2.2   Publication Review

Inmates are permitted to purchase publications from outside vendors. These purchases must meet the property and content requirements of the Wisconsin Administrative Code, Division of Adult Institutions ("DAI") policy, as well as individual facility policies. When packages arrive, staff in the property department are the first to open and review the contents. If a publication clearly violates any policies, such as containing nudity, pornography, or encouraging violence or gang affiliation, the publication is denied and a notification is sent to the inmate.

Kemper is not concerned with these sorts of denials made by the property department. He is instead concerned with the additional scrutiny his property receives from staff in the Psychological Services Unit ("PSU"). Inmates are prohibited from possessing publications that are inconsistent

with or pose a threat to the safety, treatment, or rehabilitative goals of the inmate under DAI Policy 309.04.01(V)(F)(7) and Wis. Admin. Code § DOC 309.04(4)(c)(8)(c), or publications that are contrary to an individual's criminogenic needs under DAI Policy 309.20.03(I)(C)4.a. While officers who review incoming property are capable of identifying and denying prohibited nudity, pornography, or other clear policy violations, they are not necessarily aware of an inmate's criminal history, particularly as a sex offender, or the inmate's treatment and rehabilitative goals. Thus, it is appropriate to have trained professionals who are knowledgeable about the specific treatment or rehabilitative needs of the inmates determine the suitability of certain materials for particular inmates.

In the case of publications containing questionable depictions of children, these may require additional scrutiny depending on the intended recipient. If such a publication arrives, the property department contacts the PSU and asks if the materials need additional scrutiny. If the PSU says yes, the items are held pending the psychologist's determination. Kemper wants a decision which would allow him to get his publications without this extra review.

Approximately nine months ago, Dr. Lisa Buhs ("Buhs"), a licensed psychologist working in the PSU, began conducting publication reviews for the property department of those publications that are suspected to be contrary to inmates' rehabilitative needs. Prior to that time, the PSU supervisor, Dr. Michael Hagan ("Hagan"), conducted these reviews, but as he neared retirement Buhs began sharing responsibility for this task. She now conducts all publication reviews.

Dr. Buhs has a Ph.D in psychology and has been licensed to practice psychology in Wisconsin since 2000. She has worked as a licensed

psychologist at Racine for about eighteen years. She uses her education, experience, training, and professional discretion, as well as the guidelines of Wisconsin Administrative Code §§ DOC 309.04 and 309.05 and related DAI policies, to determine what materials are appropriate for inmates. Buhs reviews each publication separately and bases her decision to approve or deny each publication on the images in the publication and the appropriateness of the content for the inmate. She tries to be consistent in her decision-making.

When deciding whether publications are appropriate for a sex offender, the inmate's treatment status is not a factor relevant to Buhs' decision. In other words, a child sex offender will not be allowed to have publications containing sexualized depictions of children regardless of whether that inmate has never been in treatment, has started but left treatment, is in treatment, or has completed treatment. Buhs opines that whatever the inmate's treatment status, a publication of this nature would be contrary to a child sex offender's rehabilitation goals.[3]

Every one to two weeks, Kemper receives a box containing 10–20 publications which need to be reviewed by the PSU for appropriateness. Kemper estimates that he orders fifty publications per month. In each box of Kemper's publications, there are generally at least a couple of items which are approved. Kemper estimates 15–20 out of every fifty publications ordered are approved. In addition to Kemper, about 4–5 other inmates at Racine order publications requiring review by PSU. PSU reviews a total of about ten publications each year for inmates other than Kemper.

---

[3] In this context, "sexualized depictions of children" means images of children in which children are depicted with enlarged breasts, revealing clothing that would normally be worn by adults, or posed in sexually suggestive positions.

Kemper likes to read manga, which is the written form of anime. Buhs has denied Kemper (and other inmates) anime or manga magazines and books which regularly feature sexualized depictions of young girls and magazines containing routine depictions of nudity. According to Kemper's PSU records, Kemper has said that he fantasizes about young girls, and he admits to having persistent sexually deviant fantasies regarding young girls. In addition to hindering Kemper's opportunity to focus on healthy adult sexual images, Buhs believes that giving Kemper access to sexualized images of young girls adversely affects others on his unit who are in treatment and trying to be rehabilitated.

After Buhs identifies which publications should be denied, she is no longer involved with what happens to them. Once any necessary review is completed, the inmate receives the approved publications and notification of what items were denied using a DOC-237 form. This initiates the disposition process.

### 2.2.3   Challenging Denial of a Publication

If an inmate disagrees with a decision to deny a publication, he is permitted to file an inmate complaint through the ICRS. The complaint is received and investigated by the inmate complaint examiner, and the examiner's determination is reviewed by the appropriate reviewing authority. Kemper has complained extensively about being denied publications using the ICRS since May 2006, when he was housed at the Oshkosh Correctional Institution.

On August 31, 2016, Kemper wrote an Interview/Information Request to the institution security director. He complained that Hagan did not have permission to approve or deny books and his doing so constituted harassment and extortion. Kemper went on to say that his belief was that

only property officers and the warden on a case-by-case basis are allowed to deny publications. Deputy Warden Steven Johnson ("Johnson") responded by memo, stating that "Dr. Hagan's assessment and denial of books in question is not harassment. Dr. Hagan is operating from within the scope of his authority based on your treatment needs. If you would like, feel free to review 309.05 (Publications) for more information on your book denial." (Docket #25-4 at 3).

On September 25, 2016, Kemper wrote an Interview/Information Request to the Warden complaining about Johnson's memo. The Warden construed Kemper's note as an appeal of previous denials of books. He responded on October 6, 2016 with his own detailed memo describing why Hagan had the authority to deny certain materials along with a copy of the relevant Wisconsin Administrative Code provisions. The Warden's memo was written specifically in response to Kemper's inquiry. Thus, although it has not been sent to other similarly situated inmates, it should not be construed as indicating that only Kemper is subject to a review of questionable or potentially harmful materials. As noted above, all inmates whose rehabilitative needs require such review receive it.

### 2.2.4   Disposal of Denied Publications

Per DAI Policy 309.20.03(I)(C)(13), inmates may possess up to twenty-five publications at one time (including all books, magazines, newspapers, maps, newsletters, pamphlets, etc.). If an inmate receives additional approved publications, excess publications may need to be sent out to maintain the 25-item limit. When security staff conduct a cell search and identify an inmate with more publications than are permitted, they contact the property department and a staff member goes to the inmate's

cell and has the inmate identify which twenty-five items he wishes to keep and removes the excess items to be disposed of.

In Kemper's case, there have been several instances where the property department has removed a 100-pound box of excess publications, and yet the next day he will again be significantly over the publication limit. Kemper admitted to having about fifty publications in his cell at the time of his deposition in this matter, forty of which he had ordered himself, the rest he received from other inmates. He had four manga books in his cell at the time, including an adaptation of the Count of Monte Cristo.

Inmates may choose to dispose of non-allowable publications by sending them out, returning them to the publisher, donating them to the Racine library or other charity, or having them destroyed. Per the Racine Inmate Handbook, inmates must make this decision and notify the property room within thirty days. If an inmate files an ICRS complaint about denied materials, the publications are maintained within the property department until after the complaint is resolved and the inmate notifies the property department of his disposition choice. If the inmate does not contest the denial or does not notify the property department within thirty days of his disposition selection, the property is automatically destroyed. Kemper sends all denied publications out to his mother to store in her basement until his release.

### 2.2.5   Sex Offender Treatment

During initial intake into the Wisconsin correctional system, inmates who have committed a sex offense are normally evaluated by a psychologist and assigned a sex offender treatment need. They can be assigned no treatment, sex offender education ("SOT-1"), sex offender aftercare, moderate-risk sex offender treatment ("SOT-2"), or moderate-

high to high-risk sex offender treatment ("SOT-4"). These levels are assigned based on the risk factors evidenced in the offender's record. SOT-4 is a two-year program.

Kemper was evaluated when he began his sentence. According to the sex offender assessment report, Kemper said his offenses against young girls are instigated by "a thought of seeing a little girl naked," and he admitted to having recurrent sexual attraction toward young girls. (Docket #24-1 at 37). The evaluator recommended that "[d]espite his medium-to-low scores on the Actuarial Risk Instruments[,] his admission to having persistent sexually deviant fantasies regarding young girls in association with persistent sexually deviant behavior [indicates] his assessed level of need for sex offender programming is actually at a medium-to-high level. Psychological Services is recommending [SOT-4]." *Id.*

There are a limited number of seats available in each sex offender treatment group and there are lengthy waitlists to enroll. In order to participate in a sex offender treatment group, the inmate needs to demonstrate a willingness to accept his sexual offense convictions. An inmate who is actively appealing his criminal conviction is not permitted to enroll in sex offender treatment at any level.

Kemper initially agreed to participate in SOT-4 and was placed on a waitlist. On June 25, 2008, Dr. Lori Adams ("Adams"), a licensed psychologist at the Oshkosh Correctional Institution, entered a clinical note into Kemper's PSU file relating to Kemper's ordering and possessing inappropriate materials, including a book which graphically depicted the sexual assault or incest of a child and Japanese books depicting young females in sexually explicit poses. Additionally, Adams noted that Kemper

had attempted to procure inappropriate visual images on numerous occasions.

Kemper was ordered to mail out these publications and to cease ordering this type of material. He responded that it was his "constitutional right" to order any type of material he desired. *Id.* at 1. Adams opined that Kemper should not be allowed access to pictures of prepubescent or adolescent children because it would be detrimental to his treatment and rehabilitative goals and would reinforce his deviant arousal patterns.

Kemper was terminated from the SOT-4 program on March 5, 2009, prior to having started any group sessions, because he was found in possession of inappropriate publications and because he had decided to appeal his sex offense conviction.[4] On March 9, 2009, Buhs met with Kemper to discuss his termination. She informed him of the reasons for his termination and encouraged him to pursue treatment when he felt ready to do so.

Kemper was released onto extended supervision in October 2011, without having participated in any sex offender treatment. After his release, Kemper's supervision agent reported that he had violated the terms of his supervision by engaging in physically assaultive behavior, having contact with three minor females via Facebook, and viewing sexually explicit materials. In October 2012, Kemper was admitted to an Alternatives to Revocation ("ATR") program, pending an investigation of the supervision violations.

---

[4]Kemper says he was terminated not because of his appeal but because he refused to sign the authorization and consent forms for PSU publication review which were required for entry into the program. (Docket #32 at 3). Either way, his termination was entirely his own fault.

As part of the ATR program, Kemper entered an SOT-2 group facilitated by Dr. Dean Stolldorf ("Stolldorf") on October 10, 2012. According to Stolldorf's reports from October, November, and mid-December 2012, Kemper was progressing well in the program. Yet on Tuesday, December 18, 2012, Kemper was terminated from the group. Stolldorf noted in his final report that over the weekend Kemper "quit" the program and gave his materials to another member, telling that person to do the work for him. Stolldorf recommended continued sex offender treatment at an institution upon revocation.

After Kemper failed the ATR program, he returned to prison to serve his revocation sentence. On August 1, 2013, Kemper underwent another sex offender assessment. Dr. Robert DeYoung, a psychologist supervisor at Dodge Correctional Institution, completed the assessment, finding a continued need for SOT-4 treatment because Kemper had not completed the previously recommended treatment and had engaged in high-risk behaviors.

On March 31, 2015, Kemper was released onto extended supervision once again. He returned to prison on January 28, 2016, after violating the terms of his supervision, including using Facebook to contact one of his victims. He has been incarcerated at Racine on revocation since April 4, 2016.

On September 21, 2016, during an interview with a prison social worker to see if Kemper would be accepted into the SOT-4 group, Kemper told the social worker that he was appealing his conviction. On this basis, Kemper was denied a place in the group. He was told that it would be up

to him to contact PSU in the future if he wanted to be reconsidered for a treatment group.[5]

Kemper has not completed any sex offender treatment program while incarcerated, nor is he enrolled in any treatment program. On July 21, 2017, Kemper sent Buhs an Interview/Information Request inquiring why she was involved with denying him publications since he was not participating in SOT-4 treatment. Kemper seems to believe that because he is not in treatment, he has a right to receive any publications without review by the PSU.

As explained above, Buhs's involvement with publication review is due to Kemper's status as a convicted child sex offender; this is not dependent on whether Kemper is participating in a treatment program. One goal of the prison system is to rehabilitate inmates and foster appropriate habits. Whether or not Kemper is participating in treatment, says Buhs, it is detrimental to these goals to permit him to have publications containing sexualized depictions of children. Doing otherwise would perpetuate his deviant thought pattern and interfere with his ability to rehabilitate, since viewing publications with sexualized depictions of young girls reinforces Kemper's deviant arousal patterns and the preoccupation that contributed to his incarceration in the first place.

---

[5]Kemper's most recent motion for reconsideration in his criminal case was denied on October 10, 2014, and the appeal has been dismissed. *See State of Wisconsin v. Terry Charles Kemper*, 2011AP002041. However, there has been no suggestion that prison officials have a duty to investigate whether the prisoner is actually appealing his conviction in order to deny him a place in a treatment group. Indeed, the notion that Kemper would falsely claim that an appeal is ongoing suggests a lack of acceptance of responsibility, one of the other crucial threshold requirements for entry into a treatment program.

## 2.2.6 Recent Publication Reviews

Kemper continues to purchase numerous publications, many of which contain copious amounts of nudity and sexualized depictions of young girls. On April 18, 2018, Buhs reviewed a box of materials Kemper ordered. Of these, she approved several publications, including Star Trek Discovery, Harley Quinn DC, Sonic the Hedgehog, and HorrorHound Magazine. On May 3, 2018, Buhs reviewed another box containing four items and approved all four. The titles included Doctor Who, DC Previews, and The Amazing Spider Man. On May 10, 2018, Buhs reviewed a third box containing eleven items. Seven were approved. The four that were denied were titled Hobby Japan, Jungle Fantasy, M Magazine, and Newtype. On May 17, 2018, Buhs reviewed two more boxes containing a total of twenty-eight items. Of those, seventeen were approved—including Gold Digger, Anime Impact, Underdog, Star Wars, Harley Quinn, Power Rangers, and Sonic the Hedgehog—and eleven were denied—including Steampunk Glamour Gazette, Hobby Japan, Newtype, Cutie Honey a Go Go, Lookers, Not Lives, As Miss Beezlebub Likes, Battle Angel Alita, and others.[6]

## 3. ANALYSIS

Kemper wishes that the publications he orders were not subject to PSU scrutiny. He brings three claims toward that end: (1) denial of his First Amendment right to receive and read mail; (2) denial of the Fourteenth Amendment's guarantee of equal protection of the law by being singled out

_____

[6]The Warden submitted examples of materials that have been denied to Kemper. (Docket #26-2). He asks that the Court permit those materials to be filed under seal and *ex parte,* as it would be harmful to Kemper to be able to view these materials on the public docket or receive them as part of the Warden's summary judgment filing. (Docket #28). The Court agrees, and it will grant the motion to submit these materials under seal and *ex parte.*

for additional scrutiny; and (3) denial of due process under the Fourteenth Amendment through the review procedure and ultimate denial of access to publications he orders. As will be explained below, none of the claims have colorable merit.

### 3.1 First Amendment

A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the correctional system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Encompassed within the First Amendment is the right to receive and read mail. *Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989). However, an inmate's First Amendment rights may be circumscribed by a prison regulation that is reasonably related to legitimate penological objectives. *Turner v. Safley*, 482 U.S. 78, 85 (1987).

The court must consider four factors to determine whether a restriction is reasonably related to legitimate institutional interests: (1) the existence of a valid, rational connection between the regulation and a legitimate governmental interest; (2) whether there are alternative means of exercising the constitutional right; (3) the impact of the accommodation of the asserted constitutional right on staff, other inmates, and institution resources; and (4) the existence or absence of ready alternatives to the regulation that can be provided at de minimis cost to the institution. *Id.* at 89–91. These factors tend to blend together and are not meant to be weighed according to any precise formula. *Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1075 (W.D. Wis. 2000). Moreover, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections

system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Racine's policy of increased scrutiny for publications ordered by sex offenders like Kemper fits comfortably within the prison's wide discretion to promote penological goals. While Kemper may not want to be rehabilitated from his deviant sexual interests, the DOC nevertheless enjoys the prerogative to try. Offender rehabilitation is not only a "legitimate objective," it is a "paramount objective of the corrections system," since most offenders will eventually rejoin society. *Pell*, 417 U.S. at 823. Preventing Kemper from possessing a limited category of publications that incite his deviant sexual desires is rationally related to furthering this objective. *See Tanksley v. Litscher*, 723 F. App'x 370, 372 (7th Cir. 2018).

Crucially, Kemper's own views as to what is or is not harmful to his rehabilitation are not controlling. *Id.* In deciding whether a restriction is constitutional, it is important to "distinguish between evidence of disputed facts and disputed matters of professional judgment." *Beard v. Banks*, 548 U.S. 521, 530 (2006). As to the latter, any inferences drawn by the court "must accord deference to the views of prison authorities. . . . Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.* (citation omitted).

Kemper disputes the learned judgments of numerous psychologists about whether he should be allowed any books he likes or whether the materials he orders are truly inappropriate, including whether they depict actual children. (Docket #32 at 5). But he failed to dispute any of the Warden's proffered facts, meaning he has not properly contested Buhs' professional opinion that the publications she has denied him would hinder

his rehabilitation. In any event, Kemper's lay opinion concerning what is appropriate for him has no chance of unseating the prison's regulations, to which the Court must afford substantial deference. Even another psychologist's contrary opinion would not be enough to show the restriction is unreasonable. *See Luchinski v. Thurmer*, No. 15-CV-028, 2015 WL 9216759, at *7 (E.D. Wis. Dec. 16, 2015). If reasonable disagreement among professionals is not enough to overturn a prison's choice of one alternative over another, Kemper's view on the matter cannot suffice. *See Amatel v. Reno*, 156 F.3d 192, 201 (D.C. Cir. 1998) ("For judges seeking only a reasonable connection between legislative goals and actions, scientific indeterminacy is determinative[.]").

Moreover, Kemper is sorely mistaken in believing that by opting out of sex offender treatment, he should have access to any materials he desires. *See id.* at 9–10. Buhs has quite reasonably opined that child sex offenders, regardless of their treatment status, cannot have materials that are contrary to their rehabilitative goals. Indeed, Kemper's lack of treatment perhaps makes it more important that he not receive inappropriate publications, since he has not been given any tools to help manage his deviant ideation.

Kemper retorts with Wis. Stat. § 301.047(3)(d), which says that prison officials "may not base any decision regarding an inmate's conditions of confinement, including discipline, or an inmate's eligibility for release, on an inmate's decision to participate or not to participate in a rehabilitation program." True, Kemper has refused to participate in sex offender treatment, but as Buhs has made clear, he is being denied prurient publications involving children because he is incarcerated as a child sex offender, not because he will not participate in treatment. All child sex offenders are denied such materials, whether they have or have not

completed treatment. Thus, Racine's PSU review policy is rationally related to a legitimate penological objective.

The other *Turner* factors are easily satisfied as well. Kemper has ample alternative avenues to exercise his First Amendment rights by receiving publications that do not contravene his rehabilitative goals. The right at issue here is Kemper's right to receive and read a range of publications so he is not "shut. . .out of the marketplace of ideas and opinions." *Gray v. Cannon*, 974 F. Supp. 2d 1150, 1160 (N.D. Ill. 2013) (citing *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005)). It cannot be defined narrowly as the right to read matter containing sexualized images. *See Thornburgh*, 490 U.S. at 417 (under *Turner*, "'the right' in question must be viewed sensibly and expansively"). Kemper can and does receive a broad range of publications that do not contain sexualized depictions of children, including newspapers, magazines, and books. *See id.* He therefore has significant and sufficient alternative opportunities to exercise his First Amendment right to receive and read mail.

Applying the third *Turner* factor, it can be assumed that Kemper would circulate the prohibited publications among other prisoners. *See Thornburgh*, 490 U.S. at 412–13. This is especially true given that Kemper has admitted to receiving many publications from other prisoners which regularly send him over the 25-publication limit. Thus, giving Kemper access to sexualized images of children could adversely affect fellow inmates' rehabilitation.

Finally, there are no ready alternatives to these prison regulations at de minimis cost. This factor "is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional

complaint." *Turner*, 482 U.S. at 90–91. Instead, the burden is on the prisoner challenging the regulation to explain the alternatives. *Gray*, F. Supp. 2d at 1161. Kemper has not done so here; he simply disagrees with the policy without offering any alternative to put in its place. Because the Court does not agree with him that he should not be subject to any increased scrutiny, Kemper needed to say something about how that scrutiny could be employed in some other, permissible way. He did not.

For all these reasons, the Court concludes that the challenged regulation withstands scrutiny under *Turner*, and thus Kemper's First Amendment claim must be dismissed.

### 3.2   Equal Protection

Kemper was also permitted to proceed on an equal protection claim based on his allegation that he is subject to greater restrictions than other incarcerated sex offenders. (Docket #13 at 3). In this vein, he views the Warden's October 2016 memo as indicating that only he is subject to PSU review. Yet at times, his equal protection theory morphs slightly, becoming an allegation that because he is not in sex offender treatment, he should be treated as a general population inmate; thus, when he is subjected to PSU review, he is not being treated like other non-sex-offender inmates. (Docket #32 at 9).

Neither theory carries the day. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The undisputed facts reveal that despite his allegations, Kemper is not actually subject to any unique treatment. All

Wisconsin inmates are prohibited from having publications that are contrary to their treatment or rehabilitative goals. When publications potentially meet this definition, property staff at Racine forward the publications to the PSU staff for review. Buhs denies publications containing sexualized depictions of children to all child sex offenders, whether untreated, in treatment, or after having completed treatment.

Kemper is, indisputably, a child sex offender, whatever his treatment status might be. For that reason, he cannot prove that he should be treated like a general population, non-sex-offender inmate. Likewise, nothing in the record suggests that other similarly situated sex offenders are subject to lesser scrutiny. The Warden's October 2016 memo was a response to Kemper's own complaint, not a new edict concerning how to address Kemper's publication orders. Thus, this claim is without merit.

### 3.3    Procedural Due Process

In his final claim, Kemper alleges that Buhs' denials of publications are not subject to any constitutionally adequate pre-denial review. This procedural due process claim arises under the Fourteenth Amendment, which prohibits state officials from depriving individuals of life, liberty, or property without due process of law. *Colon v. Schneider*, 899 F.2d 660, 666 (7th Cir. 1990). Such a claim requires Kemper to establish "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016).

Kemper's claim fails in several respects. First, he is not being permanently deprived of the publications. Any time a publication is denied, Kemper can return it to the vendor for a refund or send it out to have upon

his release. Kemper routinely sends his denied publications to his mother, who is holding them for him in her basement. The Seventh Circuit has considered this exact situation and suggested that an inmate "is not deprived of a property interest when he is permitted to send the property to a destination of his choice." *Munson v. Gaetz*, 673 F.3d 630, 638 (7th Cir. 2012); *Searcy v. Simmons*, 299 F.3d 1220, 1229 (10th Cir. 2002) (sending prisoner's property to relatives was not an actionable deprivation). The Due Process Clause only protects against permanent taking of property. *See Seibert v. Alt*, 31 F. App'x 309, 311 (7th Cir. 2002) ("An individual is entitled to an opportunity for a hearing before the state permanently deprives him of his property."). Notably, Kemper did not contest this argument by the Warden, and so the Court treats it as conceded. *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007).

Second, Kemper has no protectible property interest at stake because he is not entitled to the publications he seeks. "Before a party may assert a due process argument—procedural or substantive—it must establish that it has a 'legitimate claim of entitlement' to the right being asserted." *New Burnham Prairie Homes, Inc. v. Vill. of Burnham*, 910 F.2d 1474, 1479 (7th Cir. 1990) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "Property interests, of course, are not created by the Constitution." *Roth*, 408 U.S. at 577. They come from "existing rules or understandings that stem from an independent source such as state law." *Id.*; *Goss v. Lopez*, 419 U.S. 565, 572–73 (1975). A protected interest may be created through the enactment of regulatory measures, but only if the regulation limits an official's discretion in denying the benefit to objective and defined criteria. *Campbell v. Miller*, 787 F.2d 217, 222–23 (7th Cir. 1986).

Kemper has not pointed to any state law or regulatory measure that gives him a property interest in the publications he seeks. To the contrary, state law defines as prohibited contraband materials that are contrary to his rehabilitation. Wis. Admin. Code § DOC 309.04(4)(c)(8)(c). Nor has Kemper disputed that the publications in question are properly categorized as contraband given their relation to his status as a child sex offender. It is long settled that denying an inmate contraband does not implicate any protected property interest. *See Anderson v. Fiedler*, 798 F. Supp. 544, 549 (E.D. Wis. 1992); *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984).

Finally, even assuming a valid property interest exists in this case, Kemper's claim fails because he receives sufficient process after his publications are denied. *Mathews v. Eldridge*, 424 U.S. 319 (1976), controls this assessment. It establishes several factors for the court's consideration, including: (1) the private interest at stake; (2) the degree to which more process will make a difference in the risk of wrongful deprivation; and (3) the cost to the government of providing more procedural protection. *Id.* at 335; *Armstrong v. Daily*, 786 F.3d 529, 545 (7th Cir. 2015).[7]

---

[7]The Warden proposes that the proper framework for assessing Kemper's due process claim is *Parratt v. Taylor*, 451 U.S. 527, 543–44 (1981), which holds that a deprivation of property by the random and unauthorized act of a state official is not actionable under the Due Process Clause if post-deprivation remedies, such as state tort law, provide adequate redress. *See also Hudson v. Palmer*, 468 U.S. 517, 533 (1984). But here, Buhs' publication review is done pursuant to DOC policy; even if she at times makes erroneous decisions, that does not mean they are unauthorized. The *Parratt* doctrine is much narrower than that. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982); *Knight v. Grossman*, Case No. 16–CV–1644–JPS, 2017 WL 168906, at *6 (E.D. Wis. Jan. 17, 2017) (noting that "the key point of *Parratt* and *Hudson* is whether the deprivation of liberty was foreseeable by the state; if so, a procedural due process claim will lie").

Kemper believes that a permissible regulation must allow him to determine—and, if necessary, dispute—in advance what publications will be permitted. (Docket #32 at 5–6). He cites no authority for the proposition, and courts frequently find no pre-deprivation process is required in cases like this one. *Ellis v. Sheahan*, 412 F.3d 754, 758 (7th Cir. 2005). First, the private interest at stake is minimal; Kemper's denied publications can be sent back to the vendor for a refund or to a relative. Second, providing pre-deprivation notice and an opportunity to be heard would not materially affect the error rate in Buhs' review. Books are denied when the psychologist deems them contrary to Kemper's rehabilitative needs. He can disagree, but it is hard to imagine any facts or arguments that he could present at a hearing which would impact the denial decision.

Finally, convening a hearing each time Kemper is denied a publication would be costly. PSU staff review approximately 50 books of Kemper's per month in addition to books ordered by other sex offenders. If a hearing had to be held each time publications were denied, this would significantly impact institutional resources. The process in place—providing notice of the denial and allowing prisoners to file a grievance and a petition for a writ of certiorari in state court—is all the process that the Constitution requires. *See Munson*, 673 F.3d at 638 ("[The inmate] received all the process he was due in the form of a written notice explaining why he couldn't possess the books and a meaningful chance to be heard by a series of prison officials."); *Stewart v. McGinnis*, 5 F.3d 1031, 1037 (7th Cir. 1993) (noting that due process requires "a meaningful opportunity to be heard on" whether an item is contraband).

One last matter merits mention: Kemper claims, sporadically and without citation to any evidence, that prison officials sometimes undertake

differing levels of publication review or seem to apply their own regulations inconsistently. *See* (Docket #32 at 5). Relatedly, Kemper asserts that prison officials are denying him publications at their whim, capriciously, and in contravention of prison policy. This argument takes him nowhere, as deviation from prison policy is not a constitutional violation. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *Lewis v. Richards*, 107 F.3d 549, 553 n.5 (7th Cir. 1997); *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996). For reasons adequately covered above, the prison policy is itself constitutional, as is the process afforded to Kemper to challenge publication denials. And even if Buhs' individualized determinations about certain publications result in some inconsistencies, "inconsistent results are not necessarily signs of arbitrariness or irrationality." *Thornburgh*, 490 U.S. at 417 n.15; *Munson*, 673 F.3d at 636. Further, as has been explained, none of the prison's rules create protectible interests for Kemper, the violation of which would give rise to a due process claim, nor has he provided any competent evidence of arbitrary or capricious application of the rules in question. Thus, Kemper's due process claim must, like the rest, be dismissed.

**4.      CONCLUSION**

Kemper may not want to be bound by the determinations of licensed psychologists and the DOC that he should be forbidden publications containing sexualized depictions of children, but his personal views on the matter are of no moment. His constitutional claims in this case are wholly meritless.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #21) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** Defendant's motion to file *ex parte* and under seal one of his exhibits in connection with his motion (Docket #28) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for the issuance of subpoenas (Docket #34) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of July, 2018.

BY THE COURT:

J. P. Stadtmueller
U.S. District Court